## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:12-cv-00373-MR-DLH

| | | |
|---|---|---|
| AL HAMRA TRADING, EST., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| DIAMONDBACK TACTICAL, LLLP; | ) | |
| D-BACK ACQUISITION CO.; FIRST | ) | |
| CHOICE ARMOR AND EQUIPMENT, | ) | |
| INC.; KAREN HERMAN; and DANIEL | ) | |
| WALSH, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendants Daniel Walsh and

Karen Herman's Amended Motion for Summary Judgment [Doc. 89].

## I.     INTRODUCTION

This is the second of two civil actions brought by Al Hamra Trading,

Est. ("Al Hamra") against First Choice Armor and Equipment, Inc. ("First

Choice").  The earlier action ("the Massachusetts litigation") resulted in a

judgment in favor of Al Hamra against First Choice in the amount of

$1,114,900.  Al Hamra now seeks to recover that judgment from two former

officers of First Choice, Karen Herman ("Herman") and Daniel Walsh ("Walsh"). Additionally, Al Hamra seeks a declaration that the transfer of First Choice's assets by Herman and Walsh was a fraudulent transaction in violation of the North Carolina Fraudulent Transfer Act. In addition to seeking declaratory relief, Al Hamra also makes a claim for punitive damages.

For their part, Herman and Walsh contend that the transfer at issue was in fact a routine foreclosure under Article 9 of the Uniform Commercial Code executed by First Choice's secured creditor, a competing company which had acquired the lien rights to First Choice's debt. Herman and Walsh further contend that Al Hamra has failed to demonstrate any genuine dispute of fact to warrant the extreme remedy of piercing the corporate veil in order to impose personal liability on Herman or Walsh for the judgment previously obtained against First Choice in the Massachusetts litigation. Finally, these Defendants argue that Al Hamra has failed to show that punitive damages are warranted in this case.

## II.    PROCEDURAL BACKGROUND

Al Hamra filed its Complaint against the Defendants on November 20, 2012. [Doc. 1]. After receiving extensions of time to respond to the Complaint, Defendants Diamondback Tactical, LLLP ("Diamondback

Tactical") and D-Back Acquisition Co. ("D-Back") filed a motion to dismiss on February 5, 2013. [Doc. 12]. Herman and Walsh subsequently filed motions to dismiss as well. [Docs. 16, 35]. On July 9, 2013, the Magistrate Judge recommended denying the Defendants' motions to dismiss. [Doc. 38]. No objections were filed, and the Court accepted the Magistrate Judge's recommendation and denied the motions on August 12, 2013. [Doc. 42].

On October 23, 2013, the Clerk made an entry of default against First Choice for failing to appear in the action. [Doc. 61]. Al Hamra moved for the entry of a default judgment against First Choice [Doc. 58], but this motion was denied as premature [Doc. 62]. Issues having joined, a Case Management Order was entered on November 12, 2013. [Doc. 64].

On May 13, 2014, Al Hamra filed a notice of its acceptance of an offer of judgment of $500.00 by Diamondback Tactical and D-Back in satisfaction of all claims asserted by Al Hamra against these two Defendants. [Doc. 75].

On May 27, 2014, Defendants Walsh and Herman filed a motion for summary judgment as to the claims asserted by Al Hamra. [Doc. 87]. The Court struck this motion for failing to comply with the Case Management Order's font requirements. [Doc. 88]. The Defendants filed an amended

motion on May 28, 2014. [Doc. 89]. Al Hamra filed its opposition to the Defendants' motion on June 13, 2014 [Doc. 95], and the Defendants filed a reply on June 20, 2014 [Doc. 96]. The Court held a hearing on the Defendants' motion on August 29, 2014.

Having been fully briefed and argued, this matter is ripe for disposition.

## III. FACTUAL BACKGROUND

The forecasts of evidence, taken in the light most favorable to the Plaintiff as the non-moving party, show the following.

First Choice is a corporation that was organized under the laws of the Commonwealth of Massachusetts on January 15, 1993. [Affidavit of Karen Herman ("Herman Aff."), Doc. 85-1 at ¶ 2]. During the relevant time period, First Choice manufactured and sold protective equipment, including personal bulletproof vests. [Deposition of Karen Herman ("Herman Dep."), Doc. 95-2 at 15].

Defendant Karen Herman has been an officer and the sole director of First Choice, and has owned 100% of its outstanding and issued shares since approximately 1999.[1] [Herman Aff., Doc. 85-1 at ¶¶ 3-4]. Defendant

---

[1] Al Hamra notes in its response that "other documents suggest that Ms. Herman's husband, Edward Dovner – who founded First Choice – might own the company with

Daniel Walsh was an employee and officer of First Choice from approximately 2007 through September 22, 2010. [Affidavit of Daniel Walsh ("Walsh Aff"), Doc. 85-2 at ¶ 2]. Walsh has never owned any shares of First Choice and has never held any other ownership interest in the company. [Id. at ¶ 3; Herman Aff., Doc. 85-1 at ¶ 5].

Diamondback Tactical is a limited liability limited partnership that was organized under the laws of the State of Colorado on August 9, 2001. [Diamondback Certificate of Limited Partnership, Doc. 85-8]. For a number of years, Diamondback Tactical was a competitor of First Choice in the manufacture and sale of bulletproof vests. [Diamondback Tactical Interrog. Resp. No. 1, Doc. 85-5].

D-Back is a corporation that was organized under the laws of the State of Delaware on August 17, 2005. [D-Back Interrog. Resp. No. 1, Doc. 85-4]. Neither D-Back nor Diamondback Tactical, nor any company related to these entities, has ever held any shares in First Choice and has never possessed any other ownership interest therein. [Herman Aff., Doc.

Ms. Herman." [Doc. 95 at 4]. The "other documents" referred to include an affidavit submitted by Dovner in unrelated litigation in 2011, an unauthenticated website, and a reference in a contract to Dovner's status as an owner. Even assuming that Al Hamra could show a genuine dispute regarding this issue based on this forecast of evidence, it is not a material dispute, as Dovner is not a party to this litigation. Thus, his ownership interest and any resulting liability he may have is simply irrelevant to the motion before the Court.

85-1 at ¶ 6; Walsh Aff., Doc. 85-2 at ¶ 4]. D-Back was formed for the purpose of acquiring and owning Diamondback Tactical. At the time of D-Back's incorporation through December 2010, Rosemont Capital, LLC ("Rosemont"), through various investment funds, owned the controlling interest in D-Back. During that same period, Torch Hill Investment Partners ("Torch Hill"), through various investment funds, owned the largest minority interest in D-Back. In December 2010, Torch Hill invested additional funds to become the majority owner, and thus acquired the controlling interest in D-Back. [D-Back Interrog. Resp. No. 1, Doc. 85-4]. Neither Herman nor Walsh is a member or a partner in Rosemont or Torch Hill and neither has any ownership interest in, or affiliation with, Rosemont or Torch Hill. [Herman Aff., Doc. 85-1 at ¶ 8; Walsh Aff., Doc. 85-2 at ¶ 7].

Since its creation, D-Back has owned and managed Diamondback Tactical. Specifically, since 2005, D-Back has been the general partner of Diamondback Tactical and the sole member of D-Back Partnership Holdings, LLC, a Colorado limited liability company that owns 100% of the membership interests in Diamondback Tactical.[2] [D-Back Interrog. Resp. No. 2, Doc. 85-4; Organizational Chart, Doc. 85-29].

---

[2] How a non-owner can be a general partner of an LLLP is unexplained. Nevertheless, that is what is established by the uncontroverted forecast of evidence presented to the

On August 5, 2010, D-Back formed First Choice Acquisition, LLC ("First Choice Acquisition") a Delaware limited liability company of which D-Back was the sole manager and member. D-Back formed First Choice Acquisition for the purpose of acquiring the debt owed by First Choice to Sovereign Bank. First Choice Acquisition later changed its name to Diamondback Armor, LLC. [D-Back Interrog. Resp. No. 1, Doc. 85-4; Organizational Chart, Doc. 85-29].

Herman and Walsh have never been members of, limited partners in, general partners in, shareholders of, or possessed any other ownership interest in D-Back, Diamondback, First Choice Acquisition, Diamondback Armor, LLC, and/or Diamondback Partnership Holdings, LLC. [Herman Aff., Doc. 85-1 at ¶ 7; Walsh Aff., Doc. 85-2 at ¶ 6; Affidavit of Andrew Bair ("Bair Aff."), Doc. 85-3 at ¶¶ 6-7]. Further, Herman and Walsh have never occupied the position of director for any of these entities. [Herman Aff., Doc. 85-1 at ¶ 9; Walsh Aff., Doc. 85-2 at ¶ 8; D-Back Interrog. Resp. No. 3, Doc. 85-4; Diamondback Tactical Interrog. Resp. No. 3, Doc. 85-5]. Additionally, Herman has never been employed by any of these entities. [Herman Aff., Doc. 85-1 at ¶ 9].

Court.

In and around July 2010, First Choice was indebted to Sovereign Bank under a number of different loans and notes, including a September 14, 2007 credit note of $15,000,000, a revolver term note for $750,000, and a term note of $610,000; an April 11, 2007 loan for $840,339; and a June 24, 2004 loan for $125,000. As of August 4, 2010, the total outstanding principal, interest and fees that First Choice owed to Sovereign Bank was $9,133,325.26. [Note Sale, Assignment and Assumption Agreement, Doc. 85-9 at Schedule I; Walsh Interrog. Resp. No. 1, Doc. 85-6; Herman Interrog. Resp. No. 1, Doc. 85-7; Bair Aff., Doc. 85-3 at ¶ 13]. Sovereign Bank secured the foregoing loans and notes through multiple liens and UCC financing statements it filed with the respective Secretary of State corporations divisions in Massachusetts and North Carolina. These security instruments dictated that all of First Choice's property, including its equipment, inventory, accounts, intellectual property, and commercial tort claims, served as collateral for its debt to Sovereign. [UCC Financing Statements, Docs. 85-10 through 85-15].

Even though First Choice had previously been very successful, during this period it was performing poorly due to a number of circumstances. The company's cash flow diminished because it had recently settled a class action lawsuit against it concerning the Zylon

material in First Choice's protective vests.  This required the company to pay out millions in settlement claims.  First Choice then lost several large potential federal government contracts because the U.S. Small Business Administration deemed the company not to be in good standing.  This caused First Choice to be eliminated from a large United States Marine Corps bid that First Choice was in a good position to win, had it not been for the foregoing circumstances.  Had First Choice won this bid the foreclosure would most likely have been avoided.  Negative press from a Department of Justice lawsuit against First Choice and the resulting costs of defending the suit combined with these circumstances to make it impossible for First Choice to meet its debt obligations.  First Choice tried to manage expenses through lay-offs and reductions in salaries, but could not keep the company from defaulting on its loans.  [Walsh Aff., Doc. 85-2 at ¶ 13; Walsh Interrog. Resp. No. 2, Doc. 85-6; Herman Interrog. Resp. No. 2, Doc. 85-7].

In and around July 2010, Rosemont was the majority owner of D-Back, which owned and controlled Diamondback Tactical, and Rosemont directors Devon Archer and David Fife were managing D-Back.  Around that time, Fife presented to the board of D-Back an opportunity to purchase from Sovereign Bank the debt owed it by First Choice, and then foreclose

on the property serving as collateral for the debt (the "First Choice collateral"). D-Back then formed First Choice Acquisition for the purpose of acquiring First Choice's debt and then effectuating this foreclosure. [D-Back Interrog. Resp. No. 4, Doc. 85-4; Bair Aff., Doc. 85-3 at ¶ 14; Organizational Chart, Doc. 85-26]. The purpose of this, of course, was to eliminate a competitor while acquiring its assets.

On August 20, 2010, First Choice Acquisition and Sovereign Bank entered into a Note Sale, Assignment and Assumption Agreement (the "Note Sale Agreement"). Pursuant to this agreement, First Choice Acquisition paid Sovereign Bank $3,600,000 to purchase First Choice's total outstanding debt in the amount of $9,133,325.26, along with all of Sovereign Bank's rights and obligations under First Choice's loans and its security instruments. [Note Sale, Assignment and Assumption Agreement, Doc. 85-9 at ¶ 4(c); Bair Aff., Doc. 85-3 at ¶¶ 13-14; Herman Aff., Doc. 85-1 at ¶ 11; Walsh Aff., Doc. 85-2 at ¶ 10; Herman Interrog. Resp. No. 3, Doc. 85-7; Walsh Interrog. Resp. No. 3, Doc. 85-6; D-Back Interrog. Resp. No. 1, Doc. 85-4].

To maximize the value of the First Choice assets that it was planning to foreclose upon, D-Back sought to prevent Herman and her husband, Edward Dovner, from later competing with any of the Diamondback

corporate entities or soliciting former First Choice employees after the foreclosure. Thus, in a separate transaction, First Choice Acquisition, D-Back, Herman and Dovner executed a Noncompetition, Nondisclosure and Nonsolicitation Agreement that was effective on August 18, 2010 (the "Noncompetition Agreement"). [Noncompetition Agreement, Doc. 85-16; Bair Aff., Doc. 85-3 at ¶¶ 8-9; D-Back Interrog. Resp. No. 4, Doc. 85-4; Herman Aff., Doc. 85-1 at ¶ 13; Herman Interrog. Resp. Nos. 4-5, Doc. 85-7]. Pursuant to the Noncompetition Agreement, Herman and Dovner agreed that neither would own, manage or be associated with any person or entity engaged in the business of manufacturing or selling bulletproof vests, antiballistic helmets, armor plates and/or shields for a period of three years. [Noncompetition Agreement, Doc. 85-16 at ¶ 3; Herman Aff., Doc. 85-1 at ¶ 13]. As partial consideration for Ms. Herman to enter into the Noncompetition Agreement, First Choice Acquisition and D-Back agreed to release Herman from any liability on the loan guaranties that she had previously provided to Sovereign Bank. [Noncompetition Agreement, Doc. 85-16 at ¶ 9; Release of Guaranty, Doc. 85-17; Bair Aff., Doc. 85-3 at ¶ 10; Herman Aff., Doc. 85-1 at ¶ 14; D-Back Interrog. Resp. No. 9, Doc. 85-4; Herman Interrog. Resp. No. 4, Doc. 85-7].

As partial consideration for Dovner to enter into the Noncompetition Agreement, First Choice Acquisition and D-Back agreed to assign to Dovner and Herman First Choice's rights in the then-pending litigation captioned <u>First Choice Armor & Equipment, Inc. v. Toyobo America, Inc. et al.,</u> No. 1:09-cv-11380 (D. Mass) (the "<u>Toyobo</u> Litigation") in the event that First Choice Acquisition acquired such rights through its foreclosure on the First Choice collateral. [Noncompetition Agreement, Doc. 85-16 at ¶ 8]. Following the foreclosure sale, however, these rights were assigned only to Dovner; Herman did not receive any consideration or monies from any settlement of the <u>Toyobo</u> litigation. [D-Back Interrog. Resp. No. 10, Doc. 85-4; Herman Interrog. Resp. No. 5, Doc. 85-7]. D-Back further agreed to pay Dovner $350,000 in cash. [Noncompetition Agreement, Doc. 85-16 at ¶ 7].

First Choice Acquisition acquired the debt and foreclosed. The sale of the First Choice collateral was set for September 22, 2010. [Notice of Disposition of Collateral, Doc. 85-19; Bair Aff., Doc. 85-3 at ¶ 18; D-Back Interrog. Resp. No. 1, Doc. 85-4]. First Choice Acquisition was the successful bidder at this foreclosure sale with a credit bid of $9,405,738.37, and thus obtained title to the First Choice collateral (the "First Choice

Foreclosure Auction"). [Auctioneer's Outline, Doc. 85-20; D-Back Interrog. Resp. No. 1, Doc. 85-4].

Herman and Walsh did not direct, effect or control the First Choice Foreclosure Auction. [Herman Aff., Doc. 85-1 at ¶¶ 11, 24; Walsh Aff., Doc. 85-2 at ¶¶ 10, 13]. Neither Herman nor Walsh received any money or other consideration from the foreclosure sale. [Herman Aff., Doc. 85-1 at ¶ 12; Walsh Aff., Doc. 85-2 at ¶ 11].

After First Choice Acquisition acquired First Choice's collateral through the foreclosure, First Choice discontinued all operations and has not manufactured or sold First Choice products, including bulletproof vests, anti-ballistic helmets, armor plates and/or shields since that date. [Herman Aff., Doc. 85-1 at ¶¶ 17-23].

On December 9, 2010, First Choice Acquisition changed its name to Diamondback Armor, LLC ("Diamondback Armor"). Diamondback Armor granted Diamondback Tactical the right to use and possess all of the First Choice collateral and other assets acquired by Diamondback Armor at the First Choice Foreclosure Auction. [D-Back Interrog. Resp. No. 1, Doc. 85-4; Purchase and Sale Agreement, Docs. 85-25 through 85-26]. Diamondback Tactical continued to utilize for some time the name rights and "First Choice Armor" trademarks that it had acquired through the

auction and continued to sell products previously bearing the "First Choice Armor" name and previously marked with registration numbers that First Choice had obtained from the United States National Institute of Justice. [Bair Aff., Doc. 85-3 at ¶ 20].

Following the foreclosure, Diamondback Tactical and its owners relocated its operations from Arizona to North Carolina. As partial consideration for Dovner to enter into the Noncompetition Agreement, First Choice Acquisition committed to execute an arms-length triple net lease agreement with 209 Yelton Street Realty, LLC (the "Landlord") for the facility located at 209 Yelton Street, Spindale, North Carolina. First Choice Acquisition and the Landlord also entered into a Purchase and Sale Agreement for the property to provide First Choice Acquisition/Diamondback Armor with an option to purchase the property. [Docs. 85-22 through 85-23; Doc. 85-16 at § 10; Bair Aff., Doc. 85-3 at ¶ 21-23; Doc. 85-5 at No. 5; Doc. 85-4 at No. 7]. Dovner owned the controlling ownership interest in 209 Yelton Street Realty, LLC; Walsh and Herman have never been members of 209 Yelton Street Realty, LLC and have never had any ownership interest in that company. [Herman Aff., Doc. 85-1 at ¶ 10; Walsh Aff., Doc. 85-2 at ¶ 9; D-Back Interrog. Resp. No. 7, Doc. 85-4].

Diamondback Armor later voided the Purchase and Sale Agreement, as amended, and did not purchase the real property at 209 Yelton Street. Instead, Diamondback Armor continued to rent the property pursuant to the amended Lease Agreement. [Bair Aff., Doc. 85-3 at ¶¶ 24-25]. The Landlord sold the property around August 2011. The new owner of the property did not renew Diamondback Armor's lease. Upon the expiration of the lease, D-Back and its operating subsidiaries relocated operations to 207 Oakland Road, Spindale, North Carolina. [D-Back Interrog. Resp. No. 7, Doc. 85-4].

Upon foreclosure of the First Choice collateral, Diamondback Tactical and D-Back named Walsh as CEO for both companies effective September 22, 2010. As consideration for Walsh's agreement to accept employment with Diamondback Tactical, it paid him a $100,000 signing bonus on January 16, 2011 and an annual base salary of $275,000. Walsh was not paid for his position with D-Back. [Diamondback Tactical Interrog. Resp. Nos. 3, 5, Doc. 85-5; Walsh Aff., Doc. 85-2 at ¶ 5]. In April 2011, however, D-Back and Diamondback terminated Walsh's employment. [Walsh Aff., Doc. 85-2 at ¶ 5; Diamondback Tactical Interrog. Resp. No. 3, Doc. 85-5; D-Back Interrog. Resp. No. 5, Doc. 85-4].

In 2009, First Choice and Al Hamra entered into a contract for the sale of three thousand bulletproof vests. When First Choice failed to deliver all of the vests ordered, Al Hamra filed suit in the United States District Court for the District of Massachusetts alleging a claim for breach of contract. [See Al Hamra Trading Est. v. First Choice Armor & Equip. Inc., No. 1:09-cv-11989-RWZ (D. Mass 2009), Doc. 95-6]. On October 8, 2010 -- after the First Choice Foreclosure – Al Hamra filed a motion for partial summary judgment in the Massachusetts Litigation. First Choice did not oppose the motion and on January 6, 2011 the District Court entered judgment in favor of Al Hamra in the amount of $1,144,900. [Order, Doc. 95-11]. To date, Al Hamra has been unable to collect the judgment it obtained against First Choice.

## IV.   STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."  <u>N&O Pub. Co. v. RDU Airport Auth.</u>, 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record.  Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists.  <u>Id.</u>  Finally, in considering the motions for summary judgment filed by the defendants, the Court must view the pleadings and materials presented in the light most

favorable to the Plaintiff as the non-movant and must draw all reasonable inferences in the Plaintiff's favor as well. <u>Adams v. UNC Wilmington</u>, 640 F.3d 550, 556 (4th Cir. 2011).

## V. DISCUSSION

In this action, Al Hamra seeks to hold Herman and Walsh individually liable for the allegedly fraudulent transfer of First Choice's assets. Al Hamra contends that the foreclosure sale resulted in substantial personal gains for these Defendants, thus making the transfers fraudulent. Al Hamra further seeks to pierce the corporate veil in order to hold Defendant Herman[3] personally liable for the judgment Al Hamra obtained against First Choice in the Massachusetts litigation. The Court will address each of these arguments in turn.

### A. Fraudulent Transfer

Al Hamra seeks relief under the North Carolina Uniform Fraudulent Transfer Act ("the UFTA"), N.C. Gen. Stat. §§ 39-23.1 *et seq.*[4] Under the

---

[3] While Al Hamra asserts a corporate veil piercing claim in its Complaint against both Herman and Walsh, it states in its response brief that it is no longer pursuing a veil piercing claim against Walsh. [Doc. 95 at 11 n.8]. Accordingly, the Court will limit its discussion of this claim to Defendant Herman only.

[4] Although the First Choice foreclosure action was effectuated pursuant to Massachusetts law, Al Hamra asserts a violation of North Carolina's UFTA. The Defendants do not object to the application of North Carolina law to this claim, noting that the analysis would be the same if the law of Massachusetts were applied, as

UFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor[5], whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith intent to hinder, delay, or defraud any creditor of the debtor."  N.C. Gen. Stat. § 39-23.4(a)(1).  If a fraudulent transfer is shown, "a creditor . . . may obtain . . . [s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure . . . [a]n injunction against further disposition by the **debtor or a transferee, or both**, of the asset transferred or other property . . . ."  N.C. Gen. Stat. § 39-23.7(a)(3)(a) (emphasis added).

Here, Al Hamra appears to seek relief against Herman and Walsh both as transferors *and* as transferees.  [See Doc. 95 at 1 ("This case involves the transfer of company assets by Karen Herman, the sole owner and director of First Choice Armor and Equipment, for her own substantial

---

Massachusetts also has adopted the Uniform Fraudulent Transfer Act.  [Doc. 90 at 21 n.4].

[5] The UFTA defines a "creditor" as any person who has a right to payment "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  N.C. Gen. Stat. § 39-23.1(3)-(4).  Here, it is undisputed that Al Hamra, by virtue of the litigation then pending in Massachusetts, was a "creditor" of First Choice at the time of the allegedly fraudulent transfers at issue.

benefit.  Mr. Walsh, a company officer, participated in the transfer and also received a financial benefit.")].  Herman and Walsh, however, are not "debtors" under the UFTA.  The Act defines a "debtor" as "a person who is liable on a claim."  N.C. Gen. Stat. § 39-23.1(6).  In the context of this case, the only "debtor" is First Choice, as it is the only entity which Al Hamra sued in the Massachusetts litigation and, as such, is the only entity responsible for that judgment.  Neither Herman nor Walsh was a party to that action, and for the reasons discussed in more detail with respect to Al Hamra's veil piercing claim, neither is liable for that judgment.  Accordingly, neither Herman nor Walsh qualifies as a "debtor" under the UFTA.  Thus, they can be held liable in this action only if they qualify as "transferees" within the meaning of the Act.

In this regard, Al Hamra contends that both Herman and Walsh received substantial financial benefit from the transfer of assets from First Choice to Diamondback.[6]  While Al Hamra contends that the Defendants benefitted personally from Diamondback's foreclosure on First Choice's

_____

[6] In its Complaint, Al Hamra also alleges that Herman and Walsh "have a direct and/or indirect financial interest in Diamondback and/or D-Back."  [Doc. 1 at 12].  The undisputed forecast of evidence presented by the Defendants, however, establishes that neither Herman nor Walsh has been a member of, limited partner in, general partner in, shareholder of, or possessed any other type of ownership interest in either company. The Plaintiff appears to have abandoned this claim in its response brief, arguing instead that Herman and Walsh merely benefitted personally from the foreclosure sale.

assets, the UFTA provides Al Hamra no relief against these individuals because the transaction at issue did not involve the "transfer" of "assets" as those terms are defined by the Act.  Under the UFTA, a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an interest in an *asset* . . . ."  N.C. Gen. Stat. § 39-23.1(12).  The UFTA in turn defines "asset" as "property of the [d]ebtor," but does not include "[p]roperty to the extent it is *encumbered by a valid lien.*"  Id. at § 23.1(2) (emphasis added).  A "lien" is defined as "a charge against or an interest in property to secure payment of a debt or performance of an obligation and includes a security interest created by agreement . . . or a statutory lien."  Id. at § 23.1(8).

In the present case, the Defendants have presented a forecast of evidence showing that none of the assets at issue were transferred directly from First Choice to Herman or Walsh; all of this property was acquired by First Choice Acquisition through the Article 9 foreclosure sale.  Further, the Defendants have presented a forecast of evidence showing that all of the property that First Choice Acquisition obtained through the foreclosure sale was encumbered by valid liens, that is, the multiple UCC financing statements that First Choice Acquisition purchased from Sovereign Bank.  The Plaintiff has presented no forecast of evidence to dispute any of these

facts. Because all of the property that First Choice Acquisition obtained was encumbered by valid liens, which had been obtained years before Al Hamra commenced the Massachusetts litigation, there was no "transfer" of any "assets" to First Choice Acquisition within the meaning of the UFTA. Since the transfer to First Choice Acquisition was not fraudulent as to the Plaintiff, no subsequent transfer can be fraudulent as to the Plaintiff. Thus, no subsequent transfer of any of the First Choice assets to Herman and/or Walsh was wrongful. See Compuware Corp. v. Innovatec Communications, LLC, No. 03-C-429, 2005 WL 2076717, at *10 (E.D. Wis. Aug. 24, 2005) (holding that no "assets" were surrendered where property was encumbered by valid liens); see also Webster Indus. v. Northwood Doors, Inc., 320 F.Supp.2d 821, 837 (N.D. Iowa 2004) (holding that property constitutes an "asset" under UFTA only to the extent that it is not encumbered by valid lien).

Al Hamra does not question the validity of the liens in the present case. Further, it concedes that all of the property transferred to First Choice Acquisition and/or Diamondback Tactical was transferred in satisfaction of the liens. [Deposition of Al Hamra Rule 30(b)(6) Representative ("Al Hamra Dep."), Doc. 85-35 at 314-15]. Rather, Al Hamra's argument centers on First Choice's claim for damages in the

<u>Toyobo</u> litigation. Al Hamra argues that this claim creates a genuine issue of material fact "about whether all of the transferred assets were fully encumbered." [Doc. 95 at 18]. Specifically, Al Hamra contends that this claim for damages, "when viewed in the light most favorable to Al Hamra, shows that the value of all of First Choice's transferred assets – the <u>Toyobo</u> litigation rights, plus the other assets transferred to Diamondback – exceeded the amount of the liens that encumbered those assets." [<u>Id.</u> at 19]. The Plaintiff's reliance on First Choice's speculative claim for damages in an unrelated lawsuit, however, is simply immaterial to the issue of the value of First Choice's encumbered property at the time of the foreclosure. The Plaintiff has presented no other forecast of evidence regarding the valuation of the property that Diamondback acquired through foreclosure. Since there is no evidence before the Court regarding the value of the assets foreclosed upon, there is no evidentiary basis on which the Court can concluded that there is an issue of fact as to whether the assets were fully encumbered. The Plaintiff's simple argument that the value of the assets exceeded the amount of the lien does not substitute for a forecast of evidence. Therefore, Al Hamra has presented no genuine dispute of fact which would preclude summary judgment on this issue.[7]

---

[7] Additionally, the UFTA expressly provides that a transfer or obligation is not voidable

Even if the foreclosure sale at issue could be considered a "transfer" of "assets" within the meaning of the UFTA, Al Hamra's claim would still fail. With respect to Defendant Herman, Al Hamra contends that she received substantial personal benefit from the foreclosure, including obtaining: the rights to the <u>Toyobo</u> litigation, which resulted in a $6 million settlement; the release of her personal loan guaranties that she had previously provided to Sovereign Bank; an agreement by Diamondback to lease property owned by her husband for $18,000 per month, and the payment by Diamondback of $350,000 to her husband. These benefits were provided as consideration for Herman and Dovner executing the Noncompetition Agreement with Diamondback. Significantly, however, almost all of these transactions involve Dovner and not Herman. The <u>Toyobo</u> litigation rights were assigned only to Dovner; it is undisputed that Herman received no consideration or monies from the settlement of that case. Further, the lease agreement and the $350,000 payment were made directly to Dovner and not to Herman.[8] Thus, the only benefit Herman

_____

pursuant to § 39-23.4(a)(1) "against a person who took in good faith and for a reasonably equivalent value." N.C. Gen. Stat. § 39-23.8(a). The Plaintiff has failed to present a forecast of evidence to demonstrate that the consideration First Choice Acquisition provided to Sovereign Bank was not a reasonably equivalent value for the rights purchased or that First Choice Acquisition's credit bid at the auction was insufficient for the collateral that was foreclosed upon.

[8] Notably, Dovner is not a party to this litigation. While Al Hamra argues that such

directly received by executing the Noncompetition Agreement was the release of her liability on of her personal loan guaranties, which was reasonable consideration for the competitive protections obtained by Diamondback.

As for Defendant Walsh, Al Hamra claims only that Diamondback hired him as chief executive officer of Diamondback with a $100,000 signing bonus upon Diamondback's relocation to North Carolina.  While Al Hamra contends that Walsh received such benefits "from the deal," (i.e., the foreclosure of First Choice's assets by Diamondback), there is no reference to these benefits in any agreement in the record.   Further, Walsh's brief employment with Diamondback is simply irrelevant because the undisputed forecast of evidence shows that he and Diamondback negotiated this as a separate agreement, with distinct consideration.

For all of these reasons, the Court concludes that Al Hamra has presented no forecast of evidence showing that there is a genuine issue of material fact regarding its fraudulent transfer claims.  Therefore, the Motion for Summary Judgment of Defendants Herman and Walsh must be granted.  Additionally, for the reasons stated herein, Al Hamra's UFTA

---

benefits should be imputed to Herman as Dovner's spouse, it has cited to no legal authority for this proposition.

claim against Defendant First Choice Armor and Equipment, Inc. also fails. As such, this Defendant too will be dismissed.


**B.    Piercing the Corporate Veil**

The law of the state of incorporation governs a piercing the corporate veil claim.  See USA Trouser v. Int'l Legwear Group, Inc., No. 1:11-cv-00244-MR-DLH, 2012 WL 6553108, at *7 n.3 (W.D.N.C. Dec. 14, 2012); see also Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F.Supp. 345, 349 (M.D.N.C. 1995).  As First Choice was incorporated in the Commonwealth of Massachusetts, the Court will apply Massachusetts law to Al Hamra's veil piercing claim.

While corporate officers generally are not personally liable for a corporation's obligations, a court may allow the corporate veil to be pierced in rare situations in order to prevent gross injustice.  My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620, 233 N.E.2d 748, 752-53 (1968); Scott v. NG U.S. 1, Inc., 450 Mass. 760, 767, 881 N.E.2d 1125, 1132 (2008).  As the Massachusetts Supreme Court has recognized, piercing the corporate veil is a "means of imposing liability on an underlying cause of action such as a tort or breach of contract."  Kraft Power Corp. v.

Merrill, 464 Mass. 145, 149, 981 N.E.2d 671, 678 (2013) (citation and internal quotation marks omitted). The doctrine itself is not a cause of action but rather is "an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." Id. at 148, 981 N.E.2d at 678 (citation and internal quotation marks omitted).

Here, Al Hamra has not identified any underlying cause of action for which it seeks to hold Herman liable. Instead, it asserts that piercing the corporate veil is warranted "such that Defendant[ ] . . . Karen Herman should be held jointly and severally liable for the amount of the judgment that Al Hamra obtained against First Choice in the Massachusetts litigation." [Complaint, Doc. 1 at 15]. Such a claim does not set forth any kind of cause of action sounding in tort or breach of contract, and thus on its face does not appear to state any claim upon which the Court could grant relief.

Even assuming that a cognizable claim were pled, however, the Plaintiff has failed to present a forecast of evidence presenting any dispute of material fact as to whether the corporate veil should be pierced in this case. To determine whether piercing of the corporate veil is justified, the

Court must examine the following twelve factors: "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."   Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 n.19, 736 N.E.2d 373, 380 n.19 (2000). Here, Al Hamra relies heavily on the fact that Herman, through her ownership of 100% of the shares, exercised pervasive control over First Choice.   [See Doc. 95 at 14-17].   Pervasive control alone, however, "is insufficient to pierce the corporate veil."   Kosanovich v. 80 Worcester Street Assocs., LLC, No. 201201 CV 001748, 2014 WL 2565959, at *2 (Mass. App. Div. May 28, 2014); see also Scott, 450 Mass. at 767-68, 881 N.E.2d at 1132 ("[C]ontrol, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities.").   Notably, Al Hamra has presented no forecast of evidence to demonstrate: that Herman intermingled First Choice's assets or business activities; that First Choice was thinly capitalized at the time of the underlying transaction; that Herman

failed to observe corporate formalities; that there was an absence of corporate records; that there was a failure to pay dividends; that the officers and directors failed to function in their appropriate roles; that Herman siphoned away First Choice's assets; that Herman used First Choice for her own personal transactions; or that she used First Choice to promote fraud. For all of these reasons, Al Hamra's corporate veil piercing claim is dismissed.

### C. Punitive Damages Claim

Because Al Hamra's substantive claims have been dismissed, its claim for punitive damages must be dismissed as well.[9]

## VI. CONCLUSION

For the foregoing reasons, the Court concludes that there are no genuine disputes as to any material fact and that the Defendants are entitled to judgment as a matter of law. Accordingly, Defendant Karen Herman and Daniel Walsh's Motion for Summary Judgment is granted, and the Plaintiff's claims against these Defendants are hereby dismissed.

## **O R D E R**

---

[9] In its response to the Defendants' motion, Al Hamra also argued that summary judgment should be denied under Rule 56(d) of the Federal Rules of Civil Procedure. [Doc. 95 at 22-25]. At the summary judgment hearing, however, Al Hamra's counsel indicated that it would no longer rely on this argument. Having been withdrawn, the Court will not address Al Hamra's Rule 56(d) argument further.

**IT IS, THEREFORE, ORDERED** that Defendants Daniel Walsh and Karen Herman's Amended Motion for Summary Judgment [Doc. 89] is **GRANTED**, and the Plaintiff's claims against these Defendants are hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that the Plaintiff's claims under the UFTA and for punitive damages against the Defendant First Choice Armor and Equipment, Inc. are also **DISMISSED**.

A judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: October 8, 2014

Martin Reidinger
United States District Judge